# Exhibit A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In Re: BAYCOL PRODUCTS LITIGATION MDL No. 1431 (MJD)

COPY

This Document Relates to:

Michael Black, et al. v. Bayer Corp., et al.

Case No. 02-0199

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition of DR. W. MICHAEL SKEENS was taken on the 13th day of June, 2006, commencing at 4:01 p.m., at the Law Offices of Farrell, Farrell & Farrell, 914 Fifth Avenue, Huntington, West Virginia, before Alex Koutsunis, a Court Reporter and Notary Public in and for the State of West Virginia, pursuant to notice in the above-styled matter which is now pending and undetermined in said Court.

DISK
ENCLOSED

APPEARANCES:

TIM J. YIANNE, ESQUIRE
Bell & Bands, PLLC
30 Capitol Street
P.O. Box 1723
Charleston, WV 25326-1723
Counsel for the Plaintiffs

ERIK W. LEGG, ESQUIRE
Farrell, Farrell & Farrell
914 Fifth Avenue
Huntington, WV 25701
Counsel for the Defendant, BAYER Corporation, a foreign corporation authorized to do business in West Virginia, BAYER AG, a foreign corporation

EUGENE A. SCHOON, ESQUIRE
Sidley Austin, LLP
One South Dearborn
Chicago, IL 60603
Counsel for the Defendant, BAYER Corporation, a foreign corporation authorized to do business in West Virginia, BAYER AG, a foreign corporation

SHANE T. PRINCE, ESQUIRE
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Counsel for the Defendant, SmithKline Beecham Corporation, doing business as GlaxoSmithKline

JOHN K. McHUGH, ESQUIRE
Allen, Guthrie, McHugh & Thomas
P. O. Box 3394
Charleston, WV 25333
Counsel for the Defendant, SmithKline Beecham Corporation, doing business as GlaxoSmithKline



I N D E X


| WITNESS: | EXAMINATION: | |
|---|---|---|
| DR. W. MICHAEL SKEENS | Mr. Schoon | 4, 95 |
| | Mr. Yianne | 87 |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit Number 1 | Page | 10 |
| Exhibit Number 2 | Page | 72 |
| Exhibit Number 3 | Page | 83 |
| Reporter's Certificate | Pages | 99-100 |
| Verification of Deponent | Pages | 101-102 |




(Witness Sworn)

THEREUPON CAME,

DR. W. MICHAEL SKEENS,

called as a witness by the Defendant, Bayer Corporation, herein, who, having been first duly sworn according to law, testified as follows:

EXAMINATION

BY MR. SCHOON:

Q Dr. Skeens, my name is Gene Schoon, and I represent Bayer Corporation and Bayer AG, two of the defendants in this case, and we are here to take your deposition today. What I would like you to do is just to start off, if you could give us your full name and your office address, for the record.

A William Michael Skeens. The address is 1542 Spring Valley Drive, Huntington, West Virginia, 25704.

Q And you go by Michael Skeens?

A Mike.

Q Mike? Okay. Doctor, let me give you just a brief explanation of the deposition today. First of all, I want to tell you what this case is about. This



case is about a pharmaceutical drug that my client, Bayer, manufactured, and that was prescribed to Mr. McCollins, who is the plaintiff in this case.

And you are not a party to this case, you are not a defendant to this case, and I'm sure I speak for everybody here in saying that nobody is going to question or second guess any of your clinical judgments in connection with this matter.

Mr. McCollins is not suing for any personal injuries or bodily injuries in this case. He's not claiming any physical injury or claiming compensation for that. Instead, this is about economic loss that relates to the drug, Baycol. Okay? Are you with me so far?

A Okay.

Q And he is suing on behalf of himself and on behalf of a class of West Virginia residents to recover what he claims is economic loss related to the drug, Baycol. Now, we disagree with Mr. McCollins, and we believe that Baycol was a good drug and that it benefitted him and it benefitted many other people who took it in West Virginia and elsewhere in the United States. And we do not believe that this case should be

Page 10

chronological order. I don't need to review everything here, but under the assessment of Mr. McCollins --
A Could you confirm the date on that one more time? I want to make sure I'm looking at the right one.
Q It's February 2, 1993.
A Okay. Thank you.
Q By the way, did you have an opportunity to at least glance through the chart before coming here today?
A Yes. I tagged some pages and reviewed the chart. Yes, sir.
Q Okay. I'd like to just draw your attention -- well, just to lay a little bit of foundation, the chart that you have in front of you, which before we go any further, I'm going to have a copy of that marked as Exhibit 1 to your deposition.
A Okay.
Q Okay? And we'll make sure that that becomes a part of the record here. We have an extra copy of it, so we already know what all of the numbers are.
A Okay.
(WHEREUPON, Exhibit Number 1 was marked for

Page 11

identification and is attached hereto.)
BY MR. SCHOON:
Q Now, is this typewritten summary here a document that is -- was prepared by Dr. Oley following a visit with Mr. McCollins on February 2, 1993?
A Yes, sir.
Q And was it the practice of the physicians in the University Physicians Internal Medicine practice to prepare notes such as this following an office visit?
A Yes, sir.
Q And this would be maintained by that practice group as part of the official chart?
A That is correct.
Q Okay. Now, I'd like to just direct your attention to the third page of that report, which is Bates numbered MS000149gfm. Under the assessment -- I think you have it before you.
A Uh-huh.
Q What was the assessment of Mr. McCollins on that date?
A It appears to be borderline blood pressure elevation and hyperlipidemia.

Page 12

Q And if you turn to page -- let's see if we can find the laboratory dates, the laboratory for that -- the laboratory report for that date. Are you able to locate that?
A I should be.
Q I can probably get a reference here.
A There is a laboratory from 12/18/92, and the next one is August 24th, so I assume it's based upon the 12/18/92 data.
Q And are you able to determine -- that one would be Bates 207 on the bottom?
A That's correct.
Q Okay. And what were Mr. McCollins' lipids on the date of that -- that that laboratory was drawn, which appears to be 12/18/92?
A The total cholesterol was 288, his HDL cholesterol 53, his LDL cholesterol was 198, and his triglycerides were 185.
Q Okay. Are those elevated?
A Yes, the cholesterol is. The triglycerides at that time were still within guidelines.
Q And you mentioned that they are within guidelines. Did guidelines change over --

Page 13

A (Interrupting.) NCEP guidelines, they have evolved with different versions of it, yes.
Q So his total cholesterol was 288, you said?
A Yes, sir.
Q And his LDL was 198?
A Yes, sir.
Q And what were guidelines for those numbers at that time?
A A goal LDL for him, a male of his age, was 130.
Q At that time, being in 1993, was it the practice of -- was it your practice to put all patients who had elevated lipids on statin drugs right away?
A The usual, and still is to this day, standard of practice is when it's not associated with an acute event such as a heart attack, it would be to try lifestyle modification, diet, exercise first before you go to medication.
Q Let's turn then to the next visit in the clinic, and I believe that would be August 26, 1993.
A Yes, sir.
Q Did you see Mr. McCollins on August 26, 1993?

Page 14

A Yes, sir.
Q And what were your findings on that day?
A Well, he was --
Q With respect to the -- to his hyperlipidemia in particular.
A This is a review of the labs of 8/24/93. At that time, Dr. Oley, I believe, had ordered the labs, and his cholesterol level was 278, with an HDL of 51. His LDL was still elevated at 198.
Q Had he been using a low cholesterol diet and other non-medical means to lower his cholesterol?
A Yes, sir.
Q And were those effective?
A No, sir, not very.
Q And what did you decide to do?
A At that point he was started on Pravachol at 20 milligrams.
Q And for the record, what is Pravachol?
A It's a statin agent.
Q Do you recall at this time in 1993 what statin agents were available?
A Honestly, no. I'm sure Pravachol was, and Mevacor, but beyond that I'm not sure which ones came in

Page 15

what sequence.
Q Okay. According to our records, Mevacor, Pravachol and Zocor were all approved drugs at that time. Did you have a preference for prescribing one or another of the statins at that period of time?
A Depending on the time frame, it may have been based upon what studies were out there as far a preventative -- primary and secondary preventative studies, but off the top of my head I don't recall what the studies would have been.
Q How did you go about deciding whether to prescribe Pravachol as opposed to one of the other statins in August of 1993?
A Aside from, you know -- it would have been whatever studies were available and whatever experience I had with tolerability. There were older drugs out there, as well, Niacin and Lopid or gemfibrozil that would be available if you had a mixed hyperlipidemia. His is primarily his LDL cholesterol needed to be reduced. So at that point we fall into the statins.
Q When you say "mixed hyperlipidemia," does that mean that he has elevated LDL and elevated triglycerides?

Page 16

A That's correct.
Q And his triglycerides, I think you told us before, were within guidelines, correct?
A Yes, sir.
Q During this period of time did you -- do you remember, did you prescribe each of the available statins or did you have a preference for one over another? Do you recall?
A That's reaching a little bit far back.
Q I know.
A Off the top of my head I would say no.
Q You would say --
A No, that I did not have --
Q Did not have a preference?
A The specific preference I recall at any given time -- and there have been times where I thought Pravachol probably was a better drug. There were other times, based upon what studies came out later, I thought Zocor might have been a better drug. But, you know, the effects of the drugs were similar as far as cholesterol-lowering partially, you know, at that point.
Q Was the literature -- that is, the medical literature -- on the statins something that you tried to

Page 17

be aware of and conversant with?
A Yes.
Q And how did you -- just in general terms, how did you make sure that you were informed about the safety and efficacy of the drugs that were available?
A Well, outside of the guidelines, you know, whatever studies were published in the major literature, you know, and in the Journal -- British Medical Journal, JAMA.
Q Okay. Did you -- was it your experience with patients that some patients responded better to one statin as opposed to another?
A Response was probably not as big a difference as tolerability. Some patients tolerated one and not the other for unknown reasons. Response was similar.
Q So did you ever have experience in your clinical practice where you would start a patient on one statin and the patient would be unable to tolerate it for one reason or another?
A Yes, sir.
Q And what would you do then?
A Withdraw the agent, give them about a week

Page 18

or so to let it clear from their system, and start a second agent.

Q And was it your experience that patients who were unable to tolerate one statin were sometimes able to tolerate another?

A Generally, yes.

Q Was it an advantage to you as a clinician to have more than one statin available?

A Yes.

Q And as time went on and Lipitor was approved and Baycol was approved, did you prescribe each of those?

A Yes.

Q And most recently in 2003, I believe, Crestor was approved. Have you used Crestor?

A I don't believe I have actually prescribed Crestor for anyone initially yet.

Q As a clinician, did you find it to be advantageous to have six statins available to you to choose from?

A Having multiple statins was an advantage, yes.

Q Okay. Even if you had a patient who was

Page 19

successfully treated with one statin, would that necessarily mean that you would continue to prescribe that statin for other patients?

A I think anytime you have an experience with patients having a good response it makes you tend to use it on other patients as well, yes.

Q And if that patient does not have a good response, then you would try another agent?

A Yes.

Q Let's turn to -- let's see, we were looking at the August 23 -- or August 26 visit. Now, given that Mr. McCollins did not respond to the diet and lifestyle changes, and so you elected to -- let me strike that.

Did you also have experience with patients who did respond to diet and lifestyle changes so that it was not necessary to prescribe the statin?

A Yes. Not very often, but occasionally.

Q Is the decision as to whether or not to prescribe a statin to a patient with hyperlipidemia one that must be made on an individual case-by-case basis?

A Yes, because your goals will vary by the patient. The patient could have established disease or what are now at this point considered like

Page 20

cardiovascular disease equivalents, like diabetes. Your goals of treatment would be trying to get the LDL to a lower level than in a person who does not have as much risk factors.

Q So every patient has to be evaluated on an individualized basis?

A Yes, sir.

Q When you prescribed statins during the period of time -- and I'm going to talk about now a period of time from '93 to -- let's say through the time that Mr. McCollins ceased to be your patient in 2002 -- when you prescribed a statin drug to the patient, was it your practice to choose the statin that would be prescribed to the patient?

A Generally, yes, but that would be restricted many times by the pharmaceutical benefits from their insurance plan.

Q Okay. So all things being equal in terms of their insurance or pharmacy benefits plan, the patient would rely on you to choose the appropriate statin?

A Generally, yes. I mean, occasionally you will have patients who come in and ask for something by

Page 21

name because they saw it on a TV commercial, but generally yes.

Q Can you ever think of an instance where somebody saw Baycol in a TV commercial and asked for it?

A Not off the top of my head, no.

Q Okay. That's good, because they never advertised it on TV.

A Okay.

Q In general, was it your experience that your patients relied on your professional medical judgment to choose the correct medicine for them to take?

A Yes.

Q Was cost of the drug sometimes a factor in your decision-making?

A Frequently, yes.

Q Was it an advantage to you in your practice if there were lower cost statins available for your patients?

A Many patients did not have prescription coverage, so, yes, it was important.

Q And if -- if a lower cost statin was

Page 26

based upon our notes and the guidelines at that time, his target would be an LDL of 130.
Q Let's look at the office visit that is recorded at page number 143. And the labs for that are on page 203, in case you needed to refer to that.
A Okay.
Q This page number 143 records a visit on November 15, 1993. And this is a note that you prepared, correct?
A Yes, sir.
Q And how was he doing in terms of his lipids at this point?
A His LDL, which was the thing we were targeting, had improved to a level of 143, which was near his goal of 130.
Q Okay. So the Pravachol was working for him at that point?
A Yes, sir.
Q He was down from 198, which I believe we saw prior to starting therapy?
A Yes, sir.
Q But he was not -- he was not yet achieving goal, correct?

Page 27

A He was near, but not quite at.
Q And I believe you characterized it as "much improved"?
A Yes, sir.
Q I'm curious about the labs -- and you may see this elsewhere -- on page 203. If you could just turn to that page.
A Okay.
Q And I noted that his cholesterol was above normal, as we have discussed, but I also noted that his uric acid was above normal.
A Minimally.
Q Minimally. And I noticed that just generally -- we may see this later on through the labs -- that his uric acid and sometimes his creatinine were either high or borderline high. Did Mr. McCollins have some sort of a kidney impairment issue going on that you're aware of?
A Not that I'm aware of, no. And the uric acid level being slightly elevated is not uncommon, which does not require intervention in someone who does not have a history of gout or kidney stones -- or uric acid stones, I should say.

Page 28

Q Okay. And as far as Mr. McCollins' blood pressure goes, how was he doing there?
A Blood pressure was 138 over 82, which was good at that point. The recheck that we did on him in the office could reflect some white coat elevation. However, the systolic ran a little bit higher at 150 to 160. So they were borderline at that point. It's not uncommon when a physician walks in the room to see somebody's pressure go up slightly from when the nurse did it.
Q His other problems are listed up above, including his prostate problems that are referred to here and elsewhere. But basically was Mr. McCollins generally healthy at this time?
A Yes, sir.
Q He was tolerating the Pravachol without any problems?
A That's correct.
Q Let's turn to pages 117 and 118. I'm going to jump ahead a little bit to November 7, 2004. Actually, I may have skipped one. Let's go back to the 3/10/94 visit. Let's see if I have anything on that.
A 3/14/94?

Page 29

Q Yes. I forgot to write down the page number on that one. Do you have it?
A 138gfm.
Q So you saw Mr. McCollins again on March 14, 1994?
A Yes, sir.
Q And was he having any problems with tolerating Pravachol at that point?
A He did not appear to have any problems at that point.
Q And how was his cholesterol at that point?
A His LDL was at 122, which is within goal range.
Q Okay, so now he is achieving goal? He had been at 140-something, and now he is down to 122, correct?
A That's correct.
Q All right. Now, there are some pages that are slightly out of order, I think. There is a note at page 118 --
A 118?
Q Right. -- dated November 7, 1994 --

Page 30

A Okay.
A -- and also November 8. Is any of that in your handwriting?
A On page -- I guess it would be page 118. The page number is missing off of this. But page 35 on our chart.
Q Okay.
A The lower right-hand corner where the CK-88 --
Q Okay.
A -- that information in that corner is in my handwriting.
Q Okay. And does that indicate that you had a CK level done on Mr. McCollins as of that date?
A Yes, sir.
Q And why did you order that test?
A He was having left leg pain. Aching, charley horse sensation, relieved by lying on his back.
Q Were you attempting to determine whether he was experiencing some early signs of rhabdomyolysis?
A Yes, sir.
Q And a CK of 88 tells you what in that regard?

Page 31

A There is no rhabdomyolysis. It does not exclude myalgia from the medication, but there is no muscle damage or inflammation ongoing.
Q Now let's turn to page 117, and this is the note of November 7, '94. This appears to be prepared by a Todd Gress?
A That's correct.
Q Was he also part of the University Physicians Internal Medicine?
A He was an internal medicine resident --
Q I see.
A -- at that point.
Q Was he working under your supervision as the attending?
A On that office visit, yes.
Q And was this a visit related to the leg pain --
A Yes.
Q -- that you were just talking about in the prior note?
A That's the dictation of that same note we were just discussing.
Q And under the subjective at the top, or the

Page 32

"S:", this is a report of what the patient advised Dr. Gress? By the way, were you there at the time?
A Yes, sir.
Q Okay. So this is what Mr. McCollins told you and Dr. Gress?
A That's correct.
Q The last sentence under subjective says, "He just stopped taking his Pravachol because of the fact that this can cause myositis and he was aware of this. He had not been doing any unusual activities on the leg and there is no history of trauma." The last two sentences say that. Do you see that?
A Yes, sir.
Q Was his action in stopping his Pravachol something -- was that consistent with the advice that you gave your patients who were on statins?
A Absolutely.
Q Under the plan or the "P" there is no indication as to whether he should begin or resume taking Pravachol, that I noticed anyway. Do you agree?
A That's correct.
Q And why would that be?
A Since it was unclear the etiology of his

Page 33

myalgia, you would not want to restart that agent until the symptoms cleared at least, if you were going to rechallenge him with it.
Q Was there a time when you resumed or directed Mr. McCollins to resume his Pravachol? I looked. I didn't -- I wasn't able to find anything.
A I do not believe that's the case. I don't believe he was ever instructed to restart it.
Q Let's talk about rhabdomyolysis and myalgia associated with statins for a minute.
A Okay.
Q How is it that you learned that the statins were associated with the risk of myositis or rhabdo?
A I believe it was after Mevacor was probably already on the market that that became a known problem. I think Mevacor was the first statin on the market.
Q And was this something that you learned through review of the literature, or if you recall, what was your unusual way of learning about adverse events associated with drugs?
A It could have been either through literature, FDA bulletin. It could have been one of our speakers at Grand Rounds at the medical school. Off the

Page 34

top of my head, I don't remember where it came from the first time.
Q Okay.
A It's a little bit far back.
Q Again, just generally, if you can tell us how you inform yourself about the risks and benefits of prescription drugs.
A Of course, the product information that comes with the medication. Any new medication, I like to review the PI that comes with it. The Medical Letter is a well-respected source. And aside from that, like I said, FDA bulletins or bulletins from the pharmacists at the hospitals, and whatever is in the literature that we come across.
Q You said you would be aware of the major medical journals as well?
A Yes, sir.
Q In your practice, did you rely upon sales representatives for pharmaceutical companies to educate you about the risks and benefits of the drugs they sold?
A Not really. I mean, they would bring studies by that were reprints from the journals. But beyond that, no.

Page 35

Q Did you rely upon any sales brochures or other types of sales oriented information in deciding the risks and benefits of the drugs?
A No.
Q And why is that?
A Obviously, they are done with a slanted view towards their product. You have to view anything like that with a jaundiced eye.
Q With regard to any of the statin drugs, do you believe that you were ever misled by any of the sales representatives for any of the drugs?
A Not by the representatives, no.
Q Did you feel that you ever misled by any sales literature or brochures that you relied upon in deciding whether to -- well, you said you didn't rely on --
A (Interrupting.) In regards to the statins, I don't think there was anything particularly out of line there, no. There have been others -- other drug classes, but that's not germane to this issue.
Q Obviously, I represent Bayer, so I'm interested in knowing whether in the case of Baycol you relied upon any of the sales literature that sales

Page 36

representatives may have left with you in deciding whether or not to prescribe it.
A Nothing beyond study reprints.
Q And when you refer to "study reprints," you're referring to articles that would have appeared in the medical journals?
A In the major medical journals. If they're in some of the smaller, not mainstream, throw-away journals, then you pretty much don't pay as much attention to those.
Q Do you have any recollection at all of ever even reading any of the sales literature that Bayer may have provided in connection with Baycol?
A Not specifically, no.
Q Do you have any general recollection of having read any of the sales literature?
A The only literature I would recall is that, efficacywise, it appeared to be as good as the other drugs that were out there. There were always questions on, you know, how much of this is a class effect, how much of it is a drug specific effect of these different statin agents, of course. And, you know, they looked like they were pretty well equal when it comes down to

Page 37

things like pricing and tolerability.
Q Did you find that Baycol was a lower priced statin than the others?
A If I remember, that is correct.
Q And I think you told me that that could sometimes be an advantage for a patient who didn't have insurance coverage?
A Yes. Sometimes it also had an influence on the pharmaceutical benefits from insurance plans as well. Whatever is cheaper, if it looks good, that's what they make you use first line.
Q I think you told us earlier you would also review the package insert or what we call the labeling for the drugs, correct?
A That's correct.
Q In reviewing that labeling, was it your expectation that the manufacturers would follow the requirements of the Food and Drug Administration as to what information could properly be put in the labeling?
A Yes.
Q In evaluating whether or not to prescribe one of the available statins to your patients during this period of time, '93 to 2002, did you also rely on

Page 38

what your colleagues' experience was?
A To a minor degree, yes.
Q So if I understand you correctly, the information you relied upon would be your own experience, the major medical journals that you would read and become familiar with, information from The Medical Letter, information from FDA, possibly information from the pharmacists?
A That's correct.
Q Are those the major sources of information?
A Yes, sir.
Q Did you ever rely -- in making decisions as to whether or not to prescribe a particular drug, did you ever rely on anecdotal individual case reports to assess the safety of a drug?
A If you hear of a negative event, that leaves sort of an impact with you. If you hear one of your colleagues has had a patient on a medication and they've had a case of rhabdo or they've had some other major side effects, those leave impressions on you.
Q Do you recall any instance where one of your colleagues had a patient on Baycol that had rhabdo?

Page 39

A No.
Q And I take it none of your patients who were on Baycol had rhabdo?
A No, sir.
Q And when you say no -- this is so somebody else reading this understands. When you say "no" in answer to my last question -- "No, none of my patients had rhabdo"? Right?
A That is correct.
Q Now, you told me that if one of your colleagues had a negative experience with a drug, that might have an impact on your decision. If you -- did you ever in your experience rely upon Med Watch reports or spontaneous reports in deciding whether or not -- spontaneous adverse event reports -- in deciding whether or not to prescribe a drug?
A The only time I ever heard anything from any type of Med Watch reports would be through the pharmacists. I think they rely more on that system.
Q Would you consider unverified spontaneous reports of adverse events to be a reliable source of information in making a decision as to the risks and benefits of a drug?

Page 40

A Unverified?
Q Right.
A No.
Q In looking at the data available to you as a physician in assessing the risks and benefits of a drug, how important is it to you to know the results of Phase III, double-blinded clinical trials?
A It's very important.
Q And with regard to -- strike that. Why are the Phase III, double-blinded clinical trials important information?
A The study must be designed properly, such as a double-blind, so that you can truly see if there is a side effect or problem that stands out, or a benefit that stands out.
Q And in our studies that are double-blind, Phase III clinical trials, are they scientifically controlled, provided they're designed correctly --
A Yes.
Q -- so that the results are reliable indicators of the risks and benefits?
A Yes.
Q Would you agree that sometimes very rare

Page 41

side effects associated with drugs cannot be detected through even very large Phase III, double-blind studies?
A True. I mean, the larger the number or the "N" of the study, the better chance you're going to pull out something that is a less common problem. But, yes, there are post-marketing events that happen that are unexpected, yes.
Q And in evaluating post-market adverse events, would you consider unverified reports of those events to be a reliable indicator of the incidence; in other words, the frequency with which they occur?
A What specifically is an unverified -- I mean, I'm assuming a verified report is something confirmed by data by the FDA.
Q Through investigation.
A Through investigation.
Q Other than somebody who simply reports that there was an event.
A I would assume unverified is basically the same as a rumor, then, which is word of mouth.
Q Well, let me see if I can define it a little bit more precisely for you. Are you familiar

Q In deciding how to manage patients on statin therapy do you rely on the American College of Cardiologists' Guidelines as well as the NCEP Guidelines?
A I think they're pretty much in step, anyway, so yes.
Q Given Mr. McCollins' elevated cholesterol levels, was it important for him to be -- and his lack of responsiveness to diet and lifestyle change -- was it important for him to be on some kind of statin therapy?
A Yes, sir.
Q And if he was not on statin therapy, what was his risk?
A I couldn't give you an exact percentage off the top of my head, but he would be at an increased risk over the years to come to develop atherosclerotic disease.
Q It looks like Mr. McCollins' blood pressure is back up again. At this point he is 190/94 and 190/96.
A Yes. His blood pressure had a tendency to fluctuate quite a bit.



Q I also noticed that -- and we may see this later on in the records -- that his cholesterol had a tendency to fluctuate quite a bit as well. Was Mr. McCollins, in your experience, a fairly compliant patient?
A I believe so. There was -- on at least one occasion I know, with a cholesterol agent, there was some confusion about really what was he taking at the time a certain lab was done on one event. But aside from that, yes.
Q Yeah. I'm going to get to that.
A I don't think compliance was a major issue with him generally.
Q Is the patient response to these agents, either the anti-cholesterol agents or the blood pressure medications -- is that an individualized issue? In other words, it can vary by patient by patient?
A Yes.
Q And in Mr. McCollins' case, it seemed to vary day by day, correct?
A That might be a bit of an overreach, but to some degree.
Q Not that it was problematic for



Mr. McCollins, but there was variability in his laboratory results and the objective findings, correct?
A Yes.
Q All right. We're making good progress. Let's jump ahead to page 95.
A Okay.
Q By the way, just so we are clear, when we look at Exhibit 1 later on, I'm skipping over most of the handwritten notes that are in here, such as the notes that just immediately precede this visit. They are all dated. Those are the actual notes that are taken during the clinic visit?
A That's correct.
Q And then it's your practice to dictate a summary of the visit following this?
A Except for walk-in visits. Some of those may not be dictated.
Q My question to you -- I'm on page 95, which is a visit of March 7, 1995 -- is here it appears that Mr. McCollins is on Zocor, 20 milligrams per day.
A Yes, sir.
Q And what I'm a little confused about is when this change took place.



A There is a note on page 103gfm, dated 10/11/95, that said his cholesterol total was 295 and he was advised to start Zocor at 10 milligrams per day.
Q Okay. Now, that's 10/11/95?
A Yes, sir.
Q But here we are on March 7, '95. That's where the confusion is on my part.
A Maybe that's 10/11/94. No.
Q Here is what I -- and I'm just going to surmise here a little bit. If you look at the top of the page --
A (Interrupting.) Oh, I'm sorry. The dictation doesn't match.
Q -- at the dictation of '96.
A That's 3/7/96, not 3/7/95.
Q Okay. That's what I wanted to get clear.
A Yes.
Q And I'm going to go backwards, then, to cover these other dates. But that page, for the record, MS000095, the correct date should be 3/7/95 -- 96, rather?
A (Witness nods head up and down.)
Q Okay. If you go to page 105, MS105, that

Page 50

was the page just -- it looks like there was a visit on July 20, 1995, and a note in what appears to be your handwriting in the corner. It says, "Discontinue Pravachol."
A That's correct.
Q And then you have an office visit for the same -- I mean, that's a complete note on 104. Can you explain to us why you discontinued his Pravachol as of July 20, 1995?
A It looks like he was tolerating it relatively well. He may -- he didn't like to take medications routinely if he didn't have to. This may have been an attempt to see if he could do okay without it. I don't have it documented any more fully than that for you.
But most likely that was the case, or some of his arthritic symptoms and things he may have thought were coming from Pravachol and wanted to change agents if he still needed to be on something, so it was discontinued and we did follow-up labs, at which point the Zocor was then started.
Q Okay. According to your note, the plan is, "The patient will discontinue his Pravachol and have his

Page 51

blood work rechecked at the time of his next visit in 4 to 5 months and return sooner if needed. If his cholesterol is elevated at that time, we will try a different agent besides Pravachol." Did I read that correctly?
A That's correct. But frequently he and his wife would get their labs done together on their own kind of schedule, so they weren't always quite in step with what I had in mind. But if he asked to do his lipid profile early and it had been long enough -- which I believe was the case on this one. It was done a little sooner than expected, but not unreasonably.
Q At the bottom of page 104 there is a handwritten note which appears to be in your handwriting?
A That's correct.
Q Cholesterol - 295. Follow-up. Start Zocor.
A Yes, sir.
Q So that was written sometime after this --
A (Interrupting.) That's correct. It was written later. That was just instructions to my nurse later.

Page 52

Q Okay. It must have been written after August 1, because that appears to be the date on which it was transcribed.
A This is based on labs from September 28th, I believe.
Q Okay. Before we jump to the September 28 labs, let's look at the July 13 labs, which should be at 194 and 195. No, wait. Maybe I'm in the same one. Yeah, okay, 195.
A 195.
Q There his cholesterol is 240, correct?
A Yes, sir.
Q And that's high?
A Well, that's high, but if look back at his previous lipid profiles you can pretty much extrapolate what his LDL is at that point, or his bad cholesterol. So probably it would have been --
Q Somewhere in the 160 range, 150 range?
A 150.
Q My question is: Is he meeting the goal at that point when he is on Pravachol?
A At times he is, at times he is not, basically.

Page 53

Q The fact that he was not consistently meeting goal, did that affect your decision to withdraw Pravachol and start him on a different agent if his cholesterol did not come down?
A That, and the question of was there any component of the medication causing his earlier symptoms, although it appeared unlikely that that was the case.
Q Okay. So the next lab that we have would be on page 194. And I gather that this is taken during the time when he was not taking any cholesterol agent, correct?
A That's correct.
Q So when he was off of statins, what was his cholesterol on September 28th, 1995?
A His total cholesterol was 295.
Q And that is back up in the range where he was before he started the Pravachol, correct?
A That's correct.
Q When did you next see Mr. McCollins? I think it was October the 11th.
A October 11th was a phone instruction note from my nurse at that point.

Page 70

Q He had a higher co-pay or whatever?
A That's correct.
Q So this decision to switch Mr. McCollins from Zocor to Baycol was determined primarily because of a cost issue, correct?
A That's correct.
Q Did you have samples of Baycol to give to Mr. McCollins to start him off, as you did in the case of Zocor?
A Most likely. That is not documented, so I can't tell you that with certainty. But Baycol generally -- when it was out on the market they were pretty good about keeping samples supplied to us, so probably we had it.
Q I ask because the prescription records that we have from his pharmacy show that the first prescription wasn't filled until -- I believe it's April 14, 2001 -- which would be consistent with your giving him some samples to start off.
A Yeah. Some of them they even had 30-day starter bottles of some of these medications, so . . .
Q And what dosage did you start Mr. McCollins on?

Page 71

A 0.4 milligrams.
Q Was that the recommended starting dose, in your experience?
A Yes.
Q Was having -- I'm sorry if I asked you this already. But having the samples available from the manufacturer was an important service that was provided so you could start patients on a new drug and see how they tolerated it?
A Yes.
Q Correct?
A Yes, sir.
Q As of this time, February 1, 2001, Baycol had been available for about three years or two and a half years in the U.S. market. Had you prescribed it to other patients?
A I would suspect so. I don't think I used it initially. With most new medications I like to give it a few months or half a year or year to see what everybody else has go wrong. Then if it seems to be okay, then I start to use them.
Q So you're a cautious physician when it comes to new medications?

Page 72

A I try to be.
Q Did you review the labeling for the package insert for Baycol at some point?
A I'm sure that I did.
MR. SCHOON: There is a section -- why don't we mark the label? That's my copy. Let me get that back to my notebook. We'll mark this as Exhibit 2, Alex.
(WHEREUPON, Exhibit Number 2 was marked for identification and is attached hereto.)
BY MR. SCHOON:
Q I'm going to hand you Exhibit 2 to your deposition.
A Okay.
Q And that's the Baycol package insert. It bears a date of 12/00, which would give you the effective date at the top. I can represent to you that this was the package insert that was in effect as of that date.
A Okay.
Q Under the section -- and I apologize because these tend not copy very well because they are printed in colored ink. Under the section, "Warnings,"

Page 73

which is on the second page --
A Okay. I see it.
Q -- there is a section called, "Skeletal Muscle."
A Yes, sir.
Q About in the middle of that paragraph it says, "Myopathy should be considered in any patient with diffuse myalgias . . ." Do you see that?
A Yes, sir.
Q Okay. It says, "Myopathy should be considered in any patient with diffuse myalgias, muscle tenderness or weakness, and/or marked elevation of CK. Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever." Do you see that section?
A Yes, sir.
Q That sounds consistent with what you told your patients?
A That's correct.
Q And it sounds consistent? Is this what you would have told Mr. McCollins before prescribing it for him?

A Yes, sir.
Q I think you told me a minute ago that you had prescribed Baycol to other patients. I don't want to go into the medical history of any other patient, but in general as of this time and through the point at which the drug was withdrawn in August of 2001, what had your experience been with Baycol?
A Tolerability was fine. I hadn't seen any cases of really any kind of myositis or myalgia issues with it.
Q Was it effective in lowering cholesterol?
A Yes.
Q And if you needed to determine whether any patient experienced any problems with Baycol, you would actually need to go back and look at the records?
A Yes, sir.
Q Similarly, if a patient of yours had any problems -- here we've got an economic problem -- but if a patient had a problem on Pravachol or Zocor or one of the other statins and you switched them to Baycol, you would also need to review the individual chart to tell me about that?
A Yes, sir.



Q Now, was it your professional medical judgment to prescribe Baycol for Mr. McCollins?
A Yes.
Q And in making that decision did you rely on any sales materials as opposed to your professional medical judgment?
A No.
Q Do you remember ever meeting with any sales representatives of Bayer or GlaxoSmithKline to discuss Baycol?
A Yes, Bayer representatives.
Q Do you have any particular recollection of what they advised you?
A Nothing specific, no.
Q Do you feel that the representatives of Bayer that you met with to talk about Baycol ever misled you as to the safety or efficacy of Bayer -- of Baycol?
A No, no.
Q Let's take a look at the labs. The next labs I have are on page 163. This was a visit of February 1, 2001.
A Okay.
Q The labs on page 163 appear to be from a



draw date on April 10, 2001, about two months later?
A That's correct.
MR. YIANNE: What was the date of that record?
MR. SCHOON: April 10th, 2001.
MR. YIANNE: Okay.
MR. SCHOON: It's at page 163.
MR. YIANNE: Okay.
BY MR. SCHOON:
Q So Mr. McCollins would have been on Baycol for approximately two months by this time, correct?
A Probably not quite two months, because he was going to finish the supply of Zocor he had, and then would be one week with no medication prior to starting Baycol. So at the time of that lab, he should have been on it about a month.
Q Okay. And how was his LDL on Baycol?
A LDL was 112.
Q Is that within your goal?
A Absolutely.
Q Wasn't that one of the better LDLs that he had?
A Yes, it is.



Q And how was his total cholesterol?
A Total cholesterol was 190.
Q That's within goal?
A Yes.
Q What is the HDL/cholesterol ratio?
A That is one way of looking at the breakdown. Basically, it comes down more importantly to low HDL puts you at higher risk, and higher LDL puts you at higher risk. So I tend to more typically use those two numbers themselves rather than a ratio between them.
Q I see.
A The ratio of HDL to cholesterol, there were some studies came out where they were using that ratio as a predictor for cardiovascular risk, but it never -- the national guidelines never really picked that up.
Q As far as you were concerned, Mr. McCollins was doing fine on Baycol at this point?
A It was perfect for him.
Q So Baycol helped Mr. McCollins?
A Yes.
Q Let's take a look -- there is a follow-up visit, I believe, to your February 1 visit, on page 25. This was a visit of June 12, 2001?

Page 78

A Yes, that's correct.
Q So he would have been on Baycol maybe about three months by this time, from February 1 to about this time?
A Right about that. Yes, sir.
Q Giving time for him to use up his Zocor?
A Yes.
Q Okay. There is a discussion of -- under "subjective" of what Mr. McCollins advised you. Do you see that?
A Yes, sir.
Q All right. And did Mr. McCollins report to you any new problems --
A No.
Q -- that would have been related in any way to Baycol?
A No.
Q In fact, the last sentence of the "subjective" says, "No other new problems identified," correct?
A Yes, sir.
Q What was your assessment of how he was doing on Baycol as of this time, June 12, 2001?

Page 79

A It appeared to be a good response, and really no side effect problems were identified.
Q I notice under the assessment and plan, you, of course, have hypertension and hypercholesterolemia, but also degenerative joint disease and degenerative lumbar disk disease among some other things there.
A Yes.
Q The degenerative joint disease and lumbar disk disease were pre-existing conditions?
A Yes, sir.
Q The next note I saw appears to be on the next page, page 24, and it appears to be a telephone record?
A Yes, sir.
Q July 19, 2001. And Mr. McCollins is complaining of low back pain?
A That's correct.
Q And then it looks like you saw Mr. McCollins a few days later on July 23, 2001; is that correct?
A Yes, sir.
Q Let's look at your note from that date,

Page 80

page number 22. What were Mr. McCollins' complaints as of that point?
A It says pain in lower back radiating around to the left testicle for five to six days. So he had seen Dr. Sharma the day before, and he was diagnosed with prostatitis and started on Macrobid.
Q Did any of these problems that he was relating to you at that point relate -- did they suggest that Baycol was involved in any way?
A Not at that point, no.
Q At any point did Mr. McCollins have any problems that you would attribute to Baycol?
A I don't believe so, but certainly not at that point.
Q Did you ever attend any seminars or dinner talks or conferences concerning Baycol, that you recall?
A It's possible, but I don't recall any.
Q The next thing that I'm aware of that relates to Baycol in Mr. McCollins' record would be a telephone message from August 9, 2001.
A That's correct.
Q Do you have that?

Page 81

A Yes, sir.
Q Does that indicate to you that Mr. McCollins had contacted your office?
A That's correct.
Q And he was aware that Baycol had been withdrawn from the market as of that point?
A It was on the news probably the night before that, but yes.
Q And what was your advice to Mr. McCollins?
A He was advised to stop the Baycol, take a week off to allow the medication to wash out of his system completely, and then start Lipitor, 20.
Q And then to have labs done in a month?
A To have labs done in a month, right.
Q What page are you on there?
A It's page 19.
Q So it wasn't necessary for you to see Mr. McCollins for this --
A (Interrupting.) To change medication, no.
Q He did not report any problems with the Baycol as of that point?
A No.
Q When did you learn that Baycol was

Page 82

withdrawn from the market?

A I don't know the exact date. I think it was on NBC Evening News or NPR.

Q In a patient like Mr. McCollins who was not having any problem with Baycol, was there any medical reason why that patient shouldn't just continue to take their prescription?

A No.

Q Was it your -- did you make an effort to identify all of your patients who were on Baycol and advise them?

A Yes, I did.

Q And what was your practice? Did you call them up on the phone or write them a letter?

A If they didn't call us, we called them and discontinued it at that point.

Q And was your advice to Mr. McCollins to wait a week and then start Lipitor?

A Yes, sir.

Q Was that basically what you were advising patients to do?

A Yes, sir.

Q And assuming that the patient didn't

Page 83

report any symptoms, any muscle symptoms, was there any reason why you had to see that patient before doing the switch?

A No, sir.

MR. SCHOON: Let's mark the letter.

(WHEREUPON, Exhibit Number 3 was marked for identification and is attached hereto.)

MR. SCHOON: I'm going to hand you a letter dated August 8, 2001, from Bayer to Healthcare Professionals concerning the withdrawal of Baycol from the market.

(Witness examines document.)

BY MR. SCHOON:

Q Do you recall if you received this letter?

A Yes, sir.

Q According to the second -- or third paragraph, rather, it says, "Our ongoing scrutiny of post-marketing reports of rhabdomyolysis, including fatalities, has revealed an increased reporting rate of rhabdomyolysis with Baycol relative to other statins, especially when gemfibrozil is co-prescribed. These data also suggest an increased reporting rate of rhabdomyolysis at the 0.8 . . . dose of Baycol alone."

Page 84

Do you see that?

A Yes, sir.

Q In the case of Mr. McCollins, he was never co-prescribed gemfibrozil, was he?

A No, sir.

Q And Mr. McCollins was never prescribed the 0.8 milligram dose of Baycol, was he?

A No, sir.

Q So would it be fair to say that the reasons why Bayer was withdrawing the drug from the market didn't particularly concern a patient in Mr. McCollins' position, correct?

A That's correct.

Q Did you have any patients who you co-prescribed gemfibrozil and Baycol with?

A Not that I recall, although I think there was something out there from somebody in the cardiology world that said they thought this was going to be a safer combination, but it never really became a standard practice. Everybody was still leery of combining statins with Lopid or gemfibrozil, or statins together with another statin. The risk scared most of us from even thinking about it, really.

Page 85

Q And in the case of Baycol, the combination was contraindicated, correct?

A On their product literature?

Q Yes.

A I believe. I believe it was.

Q If you refer to Exhibit Number 2, under "Contraindications," it says, "Concurrent treatment with gemfibrozil due to a risk for rhabdomyolysis (see WARNINGS . . .)."

A I thought -- I was pretty sure that was in there, but somebody said -- some of the cardiologists somewhere started trying to think -- or began thinking it was safer for some reason to combine it and started using it. That seemed to be where most of the combination use was coming from, not from primary care.

Q If a drug is contraindicated by the manufacturer, the clinician can still make the clinical judgment as to how he or she wants to treat the patient --

A (Interrupting.) Yes, you can.

Q -- with -- but with extreme caution, I assume?

A Extreme caution, patient education,

documentation, yes.
Q Okay. Now, just to review Mr. McCollins, again, did Baycol help Mr. McCollins, in your judgment?
A Yes.
Q Did Baycol, in your judgment, injure Mr. McCollins?
A Not that I'm aware of.
Q Was Baycol safe and effective in Mr. McCollins?
A It appeared to be.
Q And are you able to say that to a reasonable degree of medical certainty?
A Yes.
Q And did Baycol help other patients of yours?
A Yes.
Q And was it safe and effective in their cases?
A Yes, it appeared to be for all of them.
MR. SCHOON: Let me just take a couple of minute break.
THE WITNESS: Okay.
(WHEREUPON, a discussion was held off the



record.)
MR. SCHOON: Dr. Skeens, I have no further questions for you, so I appreciate very much your time and your attention to this. I appreciate your preparation in reviewing your chart. So thank you very much.
THE WITNESS: Yes, sir.
MR. YIANNE: Actually, I had a few follow-up questions.

EXAMINATION

BY MR. YIANNE:
Q You were asked a few minutes ago as to whether Mr. McCollins suffered any injury as a result of taking Baycol, and your answer to that was no. I just want to clarify that issue a little bit. Are you talking in terms of a medical injury as opposed to economic injury?
A I'm speaking purely in terms of medical injury.
Q Okay. So as you sit here today, you're not offering any medical opinions as to whether Mr. McCollins suffered an economic injury as a result of his use of Baycol?



A I'm not aware of any type of economic issue to it, but he suffered no medical side effects.
Q Okay. Well, do you know if Mr. McCollins had a co-pay for his Baycol prescription?
A I believe he did. I believe that's why we were concerned about the change in drugs earlier on his prescription plan. I believe there was a co-pay issue and tiers involved in that.
Q Okay. When he was switched from Zocor to Baycol, was that based purely on an economic factor; in other words, because of his insurance situation?
A That was the reason for the change from -- let me look back at that. The change from Zocor to Baycol was driven by the insurance benefit.
Q Okay. It wasn't because you thought Baycol was actually a more effective drug than Zocor?
A No. Zocor was doing fine.
Q And, in fact, was it Mr. McCollins who brought the issue of insurance to your attention?
A Yes, sir.
Q Are you able to conclude with medical certainty that Baycol did not cause Mr. McCollins any harm in terms of muscle aches?



A None that I'm aware of.
Q Okay. So in other words, to your knowledge, Mr. McCollins never reported any muscle aches to you while he was on Baycol?
A That's correct.
Q But is it a fair statement that he may have had muscle aches while on Baycol, he just didn't report those to you during that time period?
A It's certainly possible. Many people have minor aches and pains that they don't necessarily report. So, yes, it is possible.
Q Do you have any opinions as to whether Baycol was more effective than any of the other statins that you prescribed to your patients?
A It was probably as effective as most doses of Zocor and most doses of Lipitor.
Q So do you think it was more effective or maybe just as effective?
A It was just as effective.
Q Earlier you were asked some questions about meeting with pharmaceutical reps, and I think you indicated that you maybe had met with an individual from Bayer Corporation?