# Exhibit C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In Re: BAYCOL PRODUCTS LITIGATION MDL No. 1431

This Document Relates to:

MICHAEL EUGENE BLACK and GEORGE F. McCOLLINS, individually, and on behalf of all others similarly situated,

Plaintiffs,

v. Case No. 02-CV-199

BAYER CORPORATION, a foreign corporation authorized to do business in West Virginia, BAYER AG, a foreign corporation, and SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE; and GLAXOSMITHKLINE plc, a foreign corporation,

ORIGINAL

Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition of GEORGE F. McCOLLINS was taken on the 15th day of March, 2006, commencing at 9:15 a.m., at the Law Offices of Farrell, Farrell & Farrell, 914 Fifth Avenue, Huntington, West Virginia, before Alex Koutsunis, a Court Reporter and Notary Public in and for the State of West Virginia, pursuant to notice in the above-styled matter which is now pending and undetermined in said Court.

ALEX KOUTSUNIS
AAA COURT REPORTING SERVICE
504 Coal Exchange Building -- P. O. Box 2043
Huntington, WV 25701 -- (304) 523-4300

(Witness Sworn)

THEREUPON CAME,

GEORGE F. McCOLLINS,

called as a witness by the Defendant, Bayer Corporation, herein, who, having been first duly sworn according to law, testified as follows:

EXAMINATION

BY MR. LEGG:

Q Mr. McCollins, good morning.

A Good morning.

Q We were introduced off the record. My name is Erik Legg. I represent Bayer Corporation and Bayer AG in this lawsuit that you have filed. I understand off the record that you have never given a deposition before; is that true?

A That's correct.

MR. LEGG: Let me just go over the ground rules for a moment or two. And I'm sure that your attorney has discussed these things with you, but just so that we are all operating from the same template.

We are basically going to have a conversation today with rules, and the rules are that

Q -- as a result of taking Baycol?

A No, I don't think so.

Q Do you claim that at any time you had a physical injury that was as a result of taking Baycol?

A A physical injury to me is if someone intentionally hurts me, a physical. In other words, I don't really understand that question. I mean, physical.

Q Are you seeking -- my understanding from the Complaint, which I understand that you may not be familiar with, is that there is -- that you and the proposed Class are not making any claims for personal injuries, personal injuries, in this lawsuit; is that correct?

A Describe "personal injury".

MR. YIANNE: I think we can speed this along. They're not, and he is not seeking recovery for personal injuries.

BY MR. LEGG:

Q Have you ever taken the drug Gemfibrozil?

A Not to my knowledge, no.

Q Also known as Lopid?

A What's it used for, and I can tell you?

The only problem I have is blood pressure.

Q It's a drug that is used to lower high triglycerides.

A No, I've never taken that.

Q And you've never been -- have you ever been diagnosed with high triglycerides?

A I've been diagnosed with high cholesterol.

Q But to your knowledge, you've not been diagnosed specifically with high triglycerides?

A Not to my knowledge.

Q Are you alleging in this lawsuit that Baycol was not a safe and effective drug?

A I'm not a doctor. I'm not a chemist. I can't say that it wasn't effective. I don't -- I don't know.

Q Fair enough. You limited your answer to "effective". The same thing as to whether it was -- would you give the same answer as to whether or not it was safe?

A I don't know that it was safe. I don't know. Apparently, it wasn't safe or they wouldn't pull it off the market.

Q Do you have any information to back that

up?

A Other than just what I've been told and heard, I don't have any, no.

Q And we'll get into what you have heard. Do you seek to recover the portion -- do you seek to recover the portion of the purchase price of Baycol that came out of your pocket?

A Yes.

Q Do you seek to recover anything else in this case as far as economic damages?

A That's the only economic damage that I had.

MR. YIANNE: Also, let me add, though, whatever might be available under applicable law is also what he would seek to recover.

MR. LEGG: And based on answers he has given to this point, I understand he is not going to be able to discuss what may be available under applicable law. If he has information on what he feels he is entitled to above what we've already discussed, I would like to go through that with him. But at the same time, from the answers -- the questions I've asked and the answers he has given, I mean, I believe I've asked him what he intends to recover and what loss he believes he

at that time?

A That's correct.

Q What did the nurse tell you to do?

A To stop taking it.

Q Did she give you any other information?

A I think they called me back later and told me to -- that they had phoned in me a prescription for Lipitor instead.

Q Did you ever see an ad, an attorney's ad, on the television or in the newspaper or anywhere else?

A I saw it in the newspaper.

Q What type ad did you see?

A "If you had -- if you had taken this medication, call so-and-so."

Q Do you know whether you saw that before or after the lawsuit was filed, your lawsuit was filed?

A I saw it after the withdrawal, I think, is when I saw that; you know, after it was taken off the market.

Q At the time you saw it, had you decided whether you were going to file a lawsuit involving Baycol?

A I never even thought anything about it,

really. I never thought anything about it until I saw the ad in the paper. I believe it was in the Huntington paper.

Q Maybe I didn't understand your previous testimony. Let me ask you this. When you saw the ad in the Huntington paper --

A Correct.

Q -- was that before or after you had contacted an attorney about a Baycol lawsuit?

A I hadn't contacted any attorney until I saw the ad. Then I contacted an attorney.

Q This is what I'm asking you about.

A Right.

Q I did misunderstand your previous testimony, apparently. So you're telling me that -- the ad that you're describing, is that what prompted you to contact an attorney?

A That's correct.

Q And to the best of your memory, how long after Baycol was withdrawn from the market did you see this ad?

A I can't tell you. I don't really know.

Q Are we talking days or months?

A I don't think it was months.

Q What did you do after you saw this ad?

A I called the attorney. I called the number.

Q And who was the attorney that -- what attorney's office answered the phone?

A Bell & Bands.

MR. YIANNE: Just let me put on the record a general objection to this line of questioning as to the relevance, and I understand your counterpoint on that.

BY MR. LEGG:

Q Without asking about actual content of conversation, did you talk to any other lawyer about filing a Baycol lawsuit other than lawyers with Bell & Bands?

A No.

Q And I think we've established -- tell me if I'm wrong -- that you didn't talk to anyone else about filing a lawsuit involving Baycol --

A That's correct.

Q -- other than your lawyers?

A No.

Q Going back, sir, to Exhibit 2, which is the Plaintiff's Fact Sheet that covers Bates Numbers GFM22gfm through GFM38gfm. Looking at that fact sheet now and having had a chance to look at it with your attorney while we were on the break, is there anything in the fact sheet that you believe is inaccurate?

A Not to my knowledge.

MR. LEGG: I believe that Mr. Yianne indicated earlier that there was at least one change that had been made between the two fact sheets. I'm sorry. Scratch that. I believe Mr. Yianne indicated earlier that there was one issue that the plaintiff intends to address on the record.

MR. YIANNE: That's correct. If you look at page 14, the Bates number is GFM000035gfm. If you look at Item C, that's asking about out-of-pocket expenses as a result of taking Baycol, and, essentially, we think the term "out-of-pocket expenses" is a little bit ambiguous.

If it has to do with his cost for Baycol, then, yes, we would supplement and indicate that the plaintiff is seeking his out-of-pocket cost for the unused Baycol. But if it is talking about out-of-pocket

expenses in terms of having to go to the doctor to ask the doctor, "What is going on, has this caused me any injury?", then Mr. McCollins is not making a claim for those type of out-of-pocket expenses.

BY MR. LEGG:

Q Sir, do you agree with your attorney's characterization of your claim?

A Yes.

Q Is there anything else in Plaintiff's Fact Sheet, Exhibit 2, that you believe is incorrect?

A Not to my knowledge.

Q Is there any information that would need to be added since Plaintiff's Fact Sheet, Exhibit 2, was submitted?

A Not that I can think of.

Q Can we agree that if you testify to something that is contrary to what is in the Plaintiff's Fact Sheet, that the testimony that you give today is what we should rely upon?

A Correct.

Q I want to get some basic information on the record, but I don't want to duplicate the fact sheet. What I would like to do is have you turn to the personal

else's possession other than yours after you --
A (Interrupting.) No.
Q -- after you filled the prescription for it?
A No.
Q Have you -- do you know if you have produced in this litigation all of the medical records in your possession, all of your medical records in your possession?
A Yes, I have.
Q Do you have at home copies of any of your medical records that you have not given to your attorneys?
A I don't have any, no.
Q Referring back to the fact sheet, again, the eleventh page, section 11, which is a box that has the word "Condition" in the first cell there. Do you see the box I'm referring to?
A The top box or the bottom box?
Q I'm sorry. The bottom box, sir.
A Okay.
Q The only two places where you have marked a "yes" are beside "high cholesterol" and

"hypertension/high blood pressure." Do you agree with me?

A That's correct.

Q To the best of your ability, tell me every doctor that you have treated with for high cholesterol.

A Just Dr. Skeens.

Q To the best of your ability, tell me every doctor you have treated with for hypertension.

A Dr. Skeens and, of course, the VA doctor is doing that now.

Q If at any point today, even if it is during the lunch break or whatever, that you remember the name of the doctor at the VA, I would appreciate you telling me.

A I should have brung it. I should have brung it. I thought about it before I left. I can call my wife, and she can go -- it's on the bottle.

Q If you have an opportunity during a break, I would like to know the name of that doctor; but if not, you can provide it to Mr. Yianne after the fact and he'll give it to me.

A I should have brung it. I'm sorry.

Q Before I forget to ask this question, when

MR. YIANNE: I just want to state a general objection to this line of questioning, because, again, he is not seeking personal injury damages. Neither is the Class. And I just want to make sure that's on the record.

MR. LEGG: I understand that. I do think his health history is relevant, but I intend to -- I don't intend to beat this to death.

MR. YIANNE: I appreciate that.

THE WITNESS: I've never had any health problems. In fact, I never even had a doctor until I was probably in my sixties.

BY MR. LEGG:

Q You have treated with a urologist for some time, haven't you?

A Correct, yes.

Q Dr. Sharma?

A Correct. I have had prostate -- a little bit of prostate problems probably from the time I was in my forties.

Q And from Dr. Sharma's record -- well, how do those prostate problems that you are describing manifest? What sort of pain or discomfort has that

caused you?

A Enlarged prostate causes you a little bit of a discomfort in the rectum area. It causes maybe a little bit of discomfort in the testicles. And that's basically what it has caused me.

Q And do I understand correctly that dating back to your forties --

A Right.

Q -- at times you have had problems with aching and discomfort in those areas?

A Yes. Some, yes.

Q And that is something that you have -- Dr. Sharma has followed you for that for a long time, hasn't he?

A Yes.

Q I also understand that you have had complaints of back discomfort for some time; is that correct?

A Yes, I have.

Q Do you have a back condition?

A They told me that I have a couple of herniated discs in my back.

Q And when were you told that?

A I haven't. I mean, from my back?

Q Just in general.

A Restate what you said.

Q I'm just trying to -- I'm trying to cover your medical history a little bit. I understand that you have had some episodes of back pain that we have discussed?

A Correct.

Q I understand you have had some episodes of leg pain, which we were just discussing.

A That was coming from my back. That's what I was told.

Q Regardless of where it was coming from, I'm just asking you what other areas of your body, if any, have you had complaints of -- complaints of muscle or joint pain?

A In my legs. The muscles in my legs sometimes bother me. They have bothered me in the past.

Q When did that happen?

A I had some problems with it when I was taking Baycol.

Q Did you have problems with it before you

A I took it consistently when he prescribed it.

Q Well, what I mean is --

A I took it every day.

Q What I mean -- thank you. What I mean is: With respect to your doctor prescribing it, was it something that he prescribed, you took consistently for whatever period of time, and then at some point he took you off of it, or was it an on-again/off-again thing?

A No. It was constant.

Q Okay. So your memory is that there would have been an uninterrupted period of time from when Dr. Skeens prescribed Pravachol until the day that you took it for the very last time?

A Correct.

Q Do you recall when you stopped Pravachol?

A I do not.

Q Do you recall why?

A No.

Q Did you understand that Pravachol could cause muscle aches and pains?

A I believe Dr. Skeens told me that.

Q Do you understand that that is something

that all cholesterol medications of that type have been associated with?

A That's what they say.

MR. LEGG: Do you want to take a five-minute break?

MR. YIANNE: Yes.

MR. LEGG: We're off the record.

(WHEREUPON, from 11:15 a.m. to 11:30 a.m., a break was held off the record.)

MR. LEGG: Okay. We can go back on the record. We'll take a brief lunch break when convenient. The next exhibit, Alex, will be whatever number we're up to. This is an internal medicine office note dated 11/7/04, Bates Number MS000117gfm. It will be Exhibit 6.

(WHEREUPON, Exhibit Number 6 was marked for identification and is attached hereto.)

MR. YIANNE: There's the doctor (indicating)?

THE WITNESS: Who is that? Gress. I've never heard of him. Gress. I think he is with University Physicians. I believe.

BY MR. LEGG:

Pravachol because of the fact that this can cause myositis and he was aware of this. He had not been doing any unusual activities on the leg, and there is no history of trauma." Do you recall at times --

A (Interrupting.) Where do you see that?

Q I'm sorry. At the bottom of the first paragraph.

A On "P" on the bottom of the first paragraph?

Q Yes, the bottom of the paragraph that has an "S" beside of it.

A Okay.

Q Do you see where it says --

A I remember I stopped taking it. Yes, I did.

Q That was going to be my question. Do you recall a time when you temporarily stopped taking your Pravachol?

A Yes, I do.

Q And why did you do that?

A Because I was having this pain in my leg.

Q Why did having pain in your leg prompt you to stop taking Pravachol?

A I guess because I thought maybe that was causing my problem.
Q You knew that that could be a potential cause of that problem?
A That's correct. I remember. I did stop taking that. I do remember that now.
Q And did you start taking your Pravachol again after you met with your doctor?
A I'm assuming I did. I had forgotten that. I did stop taking it because I was -- yeah.
Q At the time you were taking -- I apologize if I asked this earlier, but I don't think I asked this precise question. At the time you were taking Pravachol, what did you understand to be the risks of Pravachol?
A Just muscle pain and stuff. That's what my understanding was.
Q Anything else?
A No.
Q Do you recall, did you -- do you recall receiving any written information about Pravachol from your doctor?
A Not any written; I think just verbal. What

I get mine at the VA now. Back then in '94, I don't remember receiving any written information from them. I don't remember. I could have, but, you know, I'm just not sure.

Q Is your testimony that you don't recall whether or not you received written information from your pharmacy about Pravachol when you filled those prescriptions?

A I cannot be sure of that. I can't.

Q Do you recall when you stopped taking Pravachol?

A No, I do not.

Q Did you take another statin other than Baycol after you took Pravachol?

A I don't remember.

Q If I represent to you your medical records indicate that after Pravachol you were switched to Zocor, does that --

A If that's what my medical records say, then that's right.

Q Well, let me ask you this way. Do you have a memory of taking Zocor prior to the time that you took Baycol?

A I took -- I took Zocor at one time, yes. I don't remember in what sequence or anything. I don't remember.

Q If your medical records indicate that you started taking Zocor in or around October of 1995, do you have any reason to disagree with that?

A No, I do not.

Q Do you remember what dosage strength of Zocor you took?

A No, I do not.

Q If your medical records indicate that you first were started -- that when you first began Zocor they started you at 10 milligrams and then moved you up to 20 milligrams, do you have any reason to disagree with that?

A No, I do not.

Q When you took Zocor, did you understand what the risks of Zocor were?

A I think they explained, the same as the rest of the statins, I'm assuming.

Q And what were those?

A Muscle -- if you have any muscle pains or whatever.

assuming. I mean, yes.

Q When you stopped taking Zocor, what was the next statin drug that you took?

A I do not remember.

Q If your medical records indicate that you stopped taking Zocor and started taking Baycol, do you have any reason to disagree with that?

A No, I do not.

MR. LEGG: Your medical records indicated that -- well, I'll show this one to you. I want to be clear about this. I'm handing Mr. Koutsunis to be marked for identification an internal medicine office visit dated 2/01/2001 -- I'm sorry. I handed you the wrong thing, Tim. No, that's right.

MR. YIANNE: Yes.

MR. LEGG: -- 2/01/2001, Bates Number MS000029gfm. It will be Exhibit 7.

(WHEREUPON, Exhibit Number 7 was marked for identification and is attached hereto.)

(Witness examines document.)

THE WITNESS: Okay. That could have been right.

BY MR. LEGG:

Q And have you had a chance to look at that first paragraph?
A Yes, I do. I did.
Q Having seen that --
A (Interrupting.) That refreshes my memory. We had a preferred and non-preferred drug at one time. Yes, we did. They had changed probably our insurance.
Q So having looked at this, I'll ask you again. What is your understanding of why you were taken off Zocor?
A Apparently, Zocor was a non-preferred drug. That's why I was taken off of it.
Q And having looked at this now, what is your recollection as to what statin you were placed on after you stopped taking Zocor?
A Well, according to this, I guess it was Baycol.
Q Is that consistent with your own memory?
A Yes, I guess. I mean, that's the reason, yes. I remember we had a preferred and non-preferred drug. Yes, I'm assuming that's why they changed me.
Q Was there a period of time that you weren't taking a statin medication between the day you stopped

Q Do you know why he chose Baycol at that time?

A I have no idea.

Q Did he ever say to you why he chose Baycol?

A No.

Q Did he give you any instructions or any warnings about Baycol?

A I assume -- I'm just assuming he did, the same -- about the muscle pain and stuff. I mean, I don't recall it, but I'm assuming he did.

Q Regardless of what he may or may not have said, you knew at that time what the general risks of statins were, correct?

A That --

MR. YIANNE: (Interrupting.) Object to the form.

MR. LEGG: Well, based on his prior testimony.

BY MR. LEGG:

Q Let me ask you. At the time you started taking Baycol, what was your understanding about the risks of statin drugs such as Baycol?

A That they could affect -- you know -- have muscle problems.

Q Do you recall any specific conversations with Dr. Skeens about Baycol?

A I don't know what you mean, "specific". I mean, I'm sure he explained to me the symptoms, you know, if it's -- a reaction from it could be. But other than that, no.

Q Do you recall him telling you anything else about Baycol?

A No.

Q Did you take the Baycol as prescribed by Dr. Skeens?

A Yes, I did.

Q During the whole time that you were taking Baycol, did you always take it in the manner and at the dosage prescribed by Dr. Skeens?

A Yes, I did.

Q Did you rely -- in taking the drug, did you rely on Dr. Skeens having chosen that drug for you?

A I mean, I trusted him as my doctor, yes.

Q What I'm saying is: Did you rely on him to have made an appropriate decision as to what drug you

should be taking for your cholesterol?

A Yes.

Q What other drugs were you taking at the same time that you took Baycol?

A Just blood pressure.

Q And what blood pressure drug were you on at that time or during that time frame?

A I think I was on -- I think I can remember that. I think it was Zebeta (sic). I may be wrong on that, but it seems like that's -- it's in one of these things I filled out, I believe, isn't it?

Q I think it was Zestoretic.

A Zestoretic, Zestoretic.

Q That's what you -- I believe that's what your fact sheets say.

A Okay. That's Zestoretic. That's what it was, right.

Q As we sit here today, do you -- again, I do have your medical records as they have been produced, but I'm asking you: As you sit here today, do you recall there being any other medication you were taking on a regular basis while you were taking Baycol?

A Other than my blood pressure medication, I

by your doctor?

A I have no idea.

Q Maybe asked another way. Do you know whether Baycol worked for you?

A I do not know.

MR. YIANNE: Just object to the form. But go ahead and answer.

MR. LEGG: And I'm not asking for medical testimony. I understand the objection.

BY MR. LEGG:

Q As a layperson, do you have a belief as to whether Baycol worked for you?

A I have no idea.

Q Without reference to the medical records, do you know whether your cholesterol levels were checked during the period of time you were on Baycol?

A They usually checked them every four months, checked my blood. So I don't remember whether it was checked while I was on the Baycol or not. I don't know.

Q Would it be fair to say that as you sit here today you don't have a recollection as to whether your cholesterol levels were checked while you were

taking Baycol or how many times within that period? Is that fair?

A That's fair.

Q When you would have -- now, you were on statin medications for several years, correct, and still are, correct?

A Correct.

Q Traditionally, where have you had your cholesterol levels checked?

A Well, when I was -- then it was University Physicians. They done it at their lab.

Q Now it's at the VA?

A Correct.

Q During the period of time you were taking Baycol, do you believe it would have always been University Physicians where you had your labs checked?

A Correct.

Q Or at least by order of someone from University Physicians?

A By order of Dr. Skeens.

Q So would you do that at Cabell or St. Mary's?

A They done it at their lab, at University --

at Cabell.

Q Did you ever keep -- did you ever keep for yourself a chart of your cholesterol levels?

A No.

Q Other than whatever may be in your medical record, do you for yourself have any documentation of how your cholesterol levels have registered over time?

A I do not.

Q Did Dr. Skeens ever talk to you about whether Baycol was working for you?

A No, he did not.

Q Did Dr. Skeens ever indicate to you that Baycol was not working for you?

A No, he did not.

Q Do you recall Dr. Skeens ever telling you what your cholesterol levels were during the period of time you were taking Baycol?

A If he done blood work during that time, he would have told me.

Q But as you sit here today, you don't remember that one way or the other? Is that fair?

A That's a fair question, but I don't really know how to answer it. If my blood was taken during the

A I have pain. I don't know whether it's related to arthritis or just getting old.

Q Well, I'm asking about that area specifically, your knees and your legs under your knees.

A My knees and legs bother me, yes, they do, if I walk a lot. If I'm active, they bother me, yes.

Q Have you had any of that abdominal pain since you stopped taking Baycol?

A No, no, I have not.

Q And you said your doctor never did arrive at a diagnosis for that pain, but it went away?

A It left. Yes, it did.

Q And you don't recall exactly when it left, either, correct?

A No.

Q And is it fair to say that it's your understanding that your doctor's office advised you to stop taking Baycol because of the fact it had been withdrawn from the market, not because of any complaints that you had had, correct?

A Correct.

Q To this day, you still have high blood pressure, correct?

A I'm on medication, yes.

Q And that has been true before, during and after Baycol, right?

A That's correct.

Q You have been on cholesterol medication before and after Baycol, correct?

A Correct.

Q Pretty consistently, right?

A Yes.

Q Where do you have aches and pains today -- not necessarily today, but now?

A At this moment?

Q No. That was a very bad question. Over the past -- in general, not specific to right now or today as we sit here, but in the recent past or during the past several years, where do you -- you said you had aches and pains. Where do you have them?

A In my back. I have -- mainly in my back. And if I exert myself, my legs bother me; my shoulders. You know, of course, what can I expect?

Q Have you ever -- we'll get to that. Have you ever had any problems with Lipitor that you're aware of?

MR. LEGG: All right. Let's mark as, I think, Exhibit 9 -- this is a printout from CVS Pharmacy which was produced along with the Plaintiff's Fact Sheet, Bates Number GFM000043gfm.

(WHEREUPON, Exhibit Number 9 was marked for identification and is attached hereto.)

MR. LEGG: I know the print on this page is not particularly good. So, Mr. McCollins, if you would direct your attention to the bottom -- say, about the bottom fourth of that list.

(Witness examines document.)

THE WITNESS: Right there (indicating). I see it.

BY MR. LEGG:

Q Starting about -- starting about eight lines up from the bottom, I see four entries for Baycol .4 milligrams.

A Correct.

Q Do you agree?

A Yes. Yes, I do.

Q And for each of those, this document indicates that the prescription came from Dr. Skeens for 30 pills, and that the price of each of those individual

prescriptions was -- it looks like $43.30, although the print it not particularly good. Would you agree with that?

A Yes.

Q And it appears -- and it also shows that for each of those four prescriptions the customer was charged $8.67?

A That's correct.

Q The dates on those four prescriptions are April 14, 2001; May 14, 2001; June 13, 2001; and July 15, 2001. Do you agree with that?

A Yes.

Q As you sit here and look at this, do you have any reason to believe that you ever had any Baycol prescriptions filled other than the four that are listed on this sheet?

A No, I never. No, I never did.

Q So as far as you are aware, what you paid out-of-pocket for Baycol would have been the sum total of those four charges of $8.67, correct?

A That's correct.

Q Did you ever receive -- have you ever received a notice of a claim of subrogation or a lien,

terms of recovery in this lawsuit?
A No.
Q You don't have any other out-of-pocket expense that you are claiming?
A No.
Q I'm not sure what it would be. No other sort of charge that you have been -- that you had to pay with respect to Baycol?
A No.
Q That's correct?
A That's correct.
Q Why is it that you -- and this is not an argument. This is a question for purposes of making the record clear. Why is it that you believe you're entitled to be -- to a recovery based on your Baycol purchases?
A Because I was -- it was a bad drug. I mean, in other words, I feel it caused me some discomfort.
Q And have we -- in the answers you have already given today, have you described all of that discomfort?
A Yes.

Q So as to your drug expenses, from the first dollar, it would have been subject to the percentage between third party pay and co-pay?

A That's correct. There was no deductible on my drugs.

Q And you have never received any sort of reimbursement for the money that you paid out-of-pocket for Baycol, correct?

A Correct.

Q Do you know whether you paid more -- after you were taken off the Baycol, after it was withdrawn from the market and you were switched from Baycol to Lipitor, do you know whether you paid more or less for the Lipitor than you did the Baycol?

A It should be on that sheet.

MR. LEGG: Take a look at it and tell me.

THE WITNESS: Let's see.

(Witness examines document.)

MR. YIANNE: Right there (indicating).

THE WITNESS: The Lipitor, I was paying $18.01 for that, it looks like.

BY MR. LEGG:

Q For the Lipitor?

A Correct.

Q And while you were taking Lipitor, were you still taking, as you had with the Baycol, one pill per day?

A Yes.

Q And what you are saying is that your out-of-pocket charge for 30 Lipitor pills was higher than for 30 Baycol pills?

A That's correct.

Q Before you went on Baycol and when you were on Zocor, you had testified earlier that the reason for that switch was because Zocor was not a preferred drug under your coverage; is that right?

A That's correct. I think that's what the paper said.

Q Was it your understanding that because of that, you would be able to get the Baycol less expensively than you could the Zocor?

A Yes.

Q Did you ever talk -- have you ever been to a pharmacy to fill a prescription and had the pharmacist ask or had the person at the desk ask you if you needed to talk to the pharmacist or if you had any questions of

you were taking Baycol. What is Zestoretic?

A It's a blood pressure -- a blood pressure medication.

Q And over the years, you've been on a number of different blood pressure medications, haven't you?

A Correct.

Q I would like you to look at -- just a moment. The 14th page of the fact sheet, in response to the question, "Are there persons whom you believe are witnesses to your claimed injuries or damages?", you have listed your wife, Peggy McCollins?

A That's correct.

Q What do you believe she would have to add to this as a witness? What would she be able to testify about?

A Well, the abdominal pain and the muscle discomfort stuff. She would probably tell you more than I do.

Q You believe that she could be more specific about when those complaints started and stopped than you are?

A No, not really. No.

today about you taking Pravachol as your first statin, then taking Zocor, then taking Baycol, then taking Lipitor, then taking Zocor again up to the present time. Is that a fair characterization?

A Right, yes.

Q Is there any other statin drug, cholesterol lowering drug, that you think you have ever taken?

A No.

Q Because you're not making a personal injury claim in this case, I would assume -- but I don't want to assume. I want to ask. You are not saying that there is anything that you are unable to do today as a result of taking Baycol that you were able to do before Baycol, are you?

A No.

Q Do you have any information -- I'm not asking you about things you have talked to your attorney about. Do you have any information as we sit here today that we haven't already discussed that you would point to to say that Baycol is not a good drug?

A No.

Q And isn't it true that that is something you would leave to a doctor, anyway?

A I would say so, yes.
Q Have you followed news reports about Baycol lawsuits?
A No.
Q I think -- well, in your Plaintiff's Fact Sheet it indicates that as of the time at least that you filled this out back in 2002 -- one of the questions was, "Had you used a computer within the past five years," or for whatever the period is, and you had said no.
A I don't even own one.
Q I was just going to bring that up to the present day.
A I don't own a computer.
Q Whether or not you own one, the real question is: At any time ever, have you gone onto a computer and looked around on the Internet about Baycol or Baycol lawsuits or the Bayer Corporation?
A I have not.
Q Have you ever talked -- to your knowledge, have you ever talked to someone who works for Bayer Corporation?
A No.

Q That would include -- well, I'll ask the question in a different way. To your knowledge, have you ever talked to a sales representative who for their job goes to doctors and promotes Baycol -- or when it was on the market, anyway, promoted Baycol?

A No.

Q Even outside of your physician-patient visits with Dr. Skeens, have you ever talked to him about this lawsuit?

A No.

Q Or about whether or not Baycol is a good drug?

A No.

Q And that question -- that was a poorly worded question. Outside of your physician-patient visits with Dr. Skeens --

A (Interrupting.) Well, I see Dr. Skeens every week. He's a good friend. I do not talk to him about any medical things outside of his office. He don't even have an office now. He's out at the VA. No, I never talked about it, no.

MR. LEGG: This was filed in Kanawha -- in the Southern District, Kanawha Division -- Charleston

into your deposition today?

A Yes.

Q And you are prepared to represent that class to the best of your ability?

A Yes.

MR. YIANNE: I don't have any additional questions at this point. Other counsel may have follow-ups.

RE-EXAMINATION

BY MR. LEGG:

Q Do you have any -- prior to taking Baycol, at any time prior in your medical history, on occasion have you suffered from leg cramps?

A Yes, if I -- well, yes.

Q And there had been occasions in the past prior to Baycol that you had actually sought medical treatment for leg cramps, correct?

A I think I talked to Dr. Skeens one time about leg cramps.

Q Do you think it was only one time? Could it have been more than once?

A Possibly. I don't know.

Q Do you recall when that was?

A No.

Q Was there any difference between the leg cramps that you talked to Dr. Skeens about and the pain in your legs that you earlier talked to me about that you say you had while you were taking Baycol?

A Yes, a lot of difference.

Q How were they different?

A Sharper pain. The leg cramps were a lot sharper. I mean, it would hurt.

Q The leg cramps you had had before Baycol were more painful --

A Yes.

Q -- than the leg pain you had that you talked about when you were taking Baycol?

A Yes, yes.

Q Where in your leg were these prior leg cramps?

A Where you get a cramp in your muscle, around in your muscle (indicating).

Q And you're pointing down to your calf area?

A Yeah.

Q Below your knee?

A Yeah.
Q And earlier when I was asking you about the aches that you complained of or the aches that you felt during the period of time when you were taking Baycol, I think you also indicated that those -- that that sensation was in the knees and in the calf below the knee, correct?
A The calf, correct.
Q Okay. So we're talking about the same area?
A Correct.
Q The leg cramps that you had prior to Baycol, was that in one leg or both?
A Mostly in this leg (indicating), my left leg.
Q (Interrupting.) Mostly in your left leg?
A (Interrupting.) Yes.
Q I'm going to repeat that because we talked -- which is my fault -- we talked over one another. So let's get the record clear. The leg cramps you had prior to taking Baycol, were those in both legs?
A The left leg mostly, the left leg. I don't